JAMES J. TORRES, State Bar No. 320192
BENJAMIN J. TOLMAN, State Bar No. 301942
**TORRES & TOLMAN, PROFESSIONAL CORPORATION**
315 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone: (415) 212-7748
Email: jtorres@torrestolman.com
btolman@torrestolman.com

*Attorneys for Plaintiff Antoine Watts*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANTOINE WATTS,<br><br>Plaintiff,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO; DEAN CRISPEN in his official and individual capacities; DARYL SOWERS in his official and individual capacities; DANIEL MOLLOY in his official and individual capacities; and DOES 1 through 20, inclusive,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

**THE PARTIES**

1. Plaintiff Antoine Watts is a United States citizen and is a resident of San Francisco County, California. Plaintiff has been employed as a Firefighter by the City and County of San Francisco during the entire period relevant to this complaint.

2. Defendant City and County of San Francisco ("San Francisco Fire Department" or "SFFD" or the "City") is now and at all times mentioned herein was, a public entity organized and existing under the laws of the State of California.

3. Defendant Daryl Sowers is an employee and agent of Defendant City and County of San Francisco. Defendant Sowers is a Firefighter employed by Defendant City and County of San Francisco. Defendant Sowers was Plaintiff's supervisor at times material to this complaint, including when he poisoned Plaintiff. Defendant Sowers acted within the course and scope of his employment and agency with Defendant City and County of San Francisco at all times material to this complaint. Plaintiff sues Defendant Sowers in his official and individual capacity.

4. Defendant Dean Crispen is an employee and agent of Defendant City and County of San Francisco. Defendant Crispen is the Fire Chief of the San Francisco Fire Department and was Plaintiff's supervisor at all times material to this complaint. Defendant Crispen acted within the course and scope of his employment and agency with Defendant City and County of San Francisco at all times. Plaintiff sues Defendant Crispen in his official and individual capacity.

5. Defendant Daniel Molloy is an employee and agent of Defendant City and County of San Francisco. Defendant Molloy is a Battalion Chief of the San Francisco Fire Department and was Plaintiff's supervisor at all times material to this complaint. Defendant Molloy acted within the course and scope of his employment and agency with Defendant City and County of San Francisco at all times. Plaintiff sues Defendant Molloy in his official and individual capacity.

6. The true names and capacities, whether individual, corporate, subsidiary, partnership, associate, or otherwise, of Defendants DOES 1 through 20, inclusive, are presently unknown to Plaintiff, who therefore sues these Defendants by such fictitious names. Plaintiff will seek leave to amend this Complaint to allege the true names and capacities of DOES 1 through 20, inclusive, when they are ascertained. Plaintiff is informed and believes, and thereon alleges,

that Defendants named in this Complaint, including DOES 1 through 20, inclusive, are responsible in some manner for one or more of the events and happenings that proximately caused the injuries and damages hereinafter alleged.

7. Unless otherwise specified, “Defendants” as used herein shall refer collectively to Defendants City and County of San Francisco, Dean Crispen, Daryl Sowers, Daniel Molloy, and Does 1 through 20, inclusive.

8. Upon information and belief, at all relevant times, each of the Defendants, including DOES 1-20, inclusive, was the agent, servant, employee, co-conspirator and/or joint venture of each of the other Defendants. In doing the things herein alleged, each and every Defendant, as well as each and every City and County of San Francisco officer, manager, employee, agent, or assign mentioned herein other than Plaintiff, was acting within the course and scope of this agency, employment, conspiracy, and/or joint venture, and was acting with the consent, permission and authorization of each of the other Defendants. All actions as alleged in the causes of action stated herein, except for those of Plaintiff, were ratified, approved, and/or authorized by the Defendants with full knowledge of such acts. Defendants are thus jointly and severally liable for such actions.

**JURISDICTION AND VENUE**

9. This Court This action arises under 42 U.S.C. §§ 1981(a), 2000(e) and 1983. Plaintiff invokes jurisdiction over his federal claim pursuant to the provisions of 28 U.S.C. § 1331 and 28 U.S.C. § 1343. The acts and practices complained of herein occurred in the County of Alameda, California, and the County of San Francisco, California, within this judicial district.

10. Jurisdiction over Plaintiff’s pendent state law claims is appropriate under 28 U.S.C. § 1367. The state law claims are related to the claims brought pursuant to the original jurisdiction of the court, and form part of the same case and controversy under Article III of the United States Constitution.

11. This Court has personal jurisdiction over all defendants as the legal violations occurred in San Francisco County, and the Defendants conduct business in San Francisco County, which is located within this judicial district.

12. Assignment to the Oakland and San Francisco Divisions of the United States District Court for the Northern District of California is appropriate pursuant to Northern District Local Rule 3-2(d).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

13. Plaintiff has exhausted all applicable administrative remedies.

14. On or about November 10, 2026, Plaintiff filed a complaint against Defendants with California's Civil Rights Department ("CRD") alleging multiple violations of California's Fair Employment and Housing Act ("FEHA"). Plaintiff immediately received a Right to Sue letter from the CRD. The foregoing complaint is deemed simultaneously filed with the U.S. Equal Employment Opportunity Commission ("EEOC") and Plaintiff was entitled to receive a right-to-sue letter from the EEOC. *See Surrell v. Cal. Water Serv.*, 518 F.3d 1097, 1104-1105 (9th Cir. 2008).

15. On or about April 15, 2026, Plaintiff submitted a Claim against the City and County of San Francisco for Money and Damages (the "Claim") with the Claims Division of the Controller's Office of the City and County of San Francisco. The Claim contained substantially the same legal causes of action, and factual premises for those claims, as this complaint. The Claim was then rejected by the City and County of San Francisco. Plaintiff has thus presented a timely governmental tort claim with Defendant City and County of San Francisco in satisfaction of Government Code section 945.4, *et seq*. CCSF rejected that claim by letter dated May 27, 2026.

16. Mr. Watts alleges that his claim was timely under the accrual principles applicable to his respective causes of action, including doctrines of ripeness, equity, and the continuing-violation doctrine where applicable. The poisoning, recurring racial harassment, displays mocking the poisoning, suppression of complaints, and race-based intimidation formed a connected course of misconduct. The same racial animus that motivated Mr. Sowers's attack continued through his subsequent harassment and the officers' efforts to protect him and silence Mr. Watts. The factual allegations below describe that course of conduct, the participating officials, and its continuation through the circumstances compelling Mr. Watts's November 2025 transfer.

17. Mr. Watts further alleges that CCSF's liability for ratifying the poisoning caused by Sowers rests on its officials' subsequent conduct and knowing adoption of Mr. Sowers's conduct, as detailed below. CCSF repeatedly represented that investigations and corrective action remained forthcoming while withholding requested investigative information. Its Chief of Staff falsely represented that Mr. Sowers had received or would receive suspensions and would transfer from Station 13. After Mr. Watts discovered in November 2025 that the transfer had not occurred, CCSF renewed its express promise of appropriate action in December 2025. However, in early 2026, Mr. Watts learned that the represented discipline had not occurred and CCSF had taken no corrective action and thus concluded that the time was ripe for him to act himself. Mr. Watts reasonably relied on CCSF's representations and, together with his repeated efforts to obtain information, eventually had enough of a factual basis for CCSF's ratification liability.

18. To the extent CCSF contends that any applicable presentation period expired before Mr. Watts submitted his Claim in April 2026, those claims should be defeated by the facts above. But in addition to these facts of ripeness and the continuing-violation doctrine, Mr. Watts alleges that CCSF is equitably estopped from asserting that defense. As detailed in summary above and in detail below, CCSF's officials pressured Watts to keep the poisoning within the department, discouraged documentation and further reporting, threatened consequences for pursuing his complaints, and, most importantly, repeatedly assured him that the department would address the misconduct once its investigation was complete. Those assurances culminated in specific false representations about discipline and transfer and an express promise of corrective action after substantiation of policy violations. Mr. Watts reasonably relied on those representations in pursuing the internal process and acted as soon as was reasonable given those circumstances. CCSF's representations and intimidation materially affected the timing of his pursuit of relief outside that process, and CCSF cannot benefit from misleading Mr. Watts in what—if CCSF were to assert a time-bar defense—would amount to a brazen attempt at defeating his meritorious Claim through these false representations by convincing Mr. Watts that he should not, and indeed could not, yet take any action of his own.

19. In sum, Mr. Watts has only acted diligently here. He repeatedly reported the misconduct, participated in investigative interviews, requested results and recordings, and sought protection from increasingly senior officials. He was led to believe that his efforts were being recognized and that appropriate action would be taken. In early 2026, however, he learned that his hopes were not being realized as Sowers had not been subjected to any form of corrective action or discipline. He thereafter presented his Claim on April 15, 2026, well within the statutory window for doing so.

## FACTUAL BACKGROUND

20. Antoine Watts is a Black man who has been employed with the San Francisco Fire Department (SFFD) as a firefighter since 2013. He has excelled in his work, loves that his job allows him to help others, and has sought to promote to Lieutenant to have a larger impact in the department and the community. Mr. Watts has worked the majority of his career at SFFD Fire Station 13, making the station essentially his second home. Among his coworkers at Station 13 is Daryle Sowers

### A. Sowers displayed discriminatory and harassing behavior throughout his firefighting career.

21. Defendant Sowers has a history of discriminatory and harassing behavior directed at SFFD coworkers spanning over years. The following are examples of his discriminatory pattern.

22. When a news story regarding a mall robbery appeared on the television in the common area at Station 13, Mr. Sowers said loudly of the visibly Black suspects: "**They should be strung up**." Other firefighters were present to hear this, including Mr. Watts, and Mr. Sowers knew the other firefighters could hear his racist comments.

23. Mr. Sowers' discriminatory conduct was not kept within the confines of the firehouse; he also openly displayed discriminatory and harassing behavior among and toward the general public while in uniform and on duty. When steering in the tiller position at the back of the firetruck, Mr. Sowers would often yell "Get a job" at the top of his lungs at people he believed were unhoused, with officers riding on the firetruck and able to hear. No action was taken by SFFD officers to correct this misconduct.

24. In January 2023, as firefighters stopped for morning coffee at an establishment close to their station, Mr. Watts and a firefighter were discussing the other firefighter's recent trip to Thailand. The firefighter brought out some currency from the country. Upon seeing this, Mr. Sowers shouted, "**What are you doing with that gook money**?" The barista behind the counter of the coffee shop was of Asian descent. Mr. Watts was mortified. Mr. Watts detailed the incident to his direct supervisor that day, Lieutenant Robert McDonald. Nothing was done to document or correct Mr. Sowers' discriminatory behavior.

**B. Watts suffers from Crohn's Disease, which exposes him to agonizing pain, bleeding, and potentially life-threatening complications from specific triggers, including pork—all facts Sowers knew well.**

25. After joining the SFFD, Mr. Watts was diagnosed with Crohn's disease, a chronic inflammatory disease that causes progressive bowel damage along the entire gastrointestinal tract through cycles of intestinal inflammation and healing that may evolve to scar tissue, known as intestinal fibrosis, and cause permanent irreversible structural damage from narrowing of the intestines (strictures). Severe, deep inflammation can also weaken the intestinal wall (penetrating disease) forming deep ulcers, fistulas and abscesses, which can result in gastrointestinal wall perforation, infections and bleeding. Not only does Crohn's cause significant disability but its complications can be fatal.[1]

26. For Mr. Watts, the disease has caused flare ups resulting in days of excruciating abdominal pain, diarrhea, vomiting, profound exhaustion, extreme weight loss, gastrointestinal bleeding, and blood loss. His symptoms have required days' long hospitalization. Pork is a known trigger for his severe symptoms, and Mr. Watts repeatedly warned Mr. Sowers and his other coworkers about that danger. He explained that consuming pork could make him seriously ill. His dietary restriction protected his health and physical safety.

27. It was common knowledge amongst Mr. Watts' coworkers, including Defendant Sowers, that pork is a major trigger for Mr. Watts' illness. Mr. Watts has shared with his

[1] References: https://pubmed.ncbi.nlm.nih.gov/38437854/ and https://www.sciencedirect.com/science/article/pii/S1470211824000253)

coworkers, including Defendant Sowers, on many occasions that he has been diagnosed with Crohn's disease, that it causes the severe symptoms just described resulting in hospitalization. hospitalized after consuming certain foods, including pork. Mr. Watts has told Sowers and the members of Station 13 many times that he has crucial dietary restrictions to prevent life threatening symptoms. When someone would cook at the firehouse, Watts would remind them that he cannot eat pork or tomatoes. Defendant Sowers was not just a passive listener when Mr. Watts informed of his Crohn's disease diagnosis. On multiple occasions Sowers asked Watts about his symptoms, even specifically asking Watts what would happen if he ate pork. Watts told Sowers and the others present at the kitchen table that his flare ups have caused him to lose 20 pounds in a week from throwing up and defecating blood and that his flare ups have been so severe that he has been hospitalized.

28. It was part of Watts' routine at Station 13 to check in with whoever is cooking a station meal to make sure that he is not allergic to any ingredients. It was standard practice to check in with all station members about their dietary restrictions. Before March 5, 2024, Mr. Sowers knew that feeding Mr. Watts pork could cause agonizing pain, gastrointestinal bleeding, extreme weight loss, and hospitalization.

**C. Sowers poisons Watts and triggers a flare up of his Crohn's disease.**

29. On March 5, 2024, Mr. Sowers served as Captain at Station 13, and was serving in this position while the regular captain, Daniel Molloy, was testing for a promotion. It is standard practice and policy within the SFFD for temporary "sit-in" Captain positions to be given to the employee with the most seniority. On this day, Mr. Watts was also on duty. Mr. Watts had far more seniority than Mr. Sowers, as Mr. Watts had worked much longer with the SFFD and had served significantly more time in officer roles than Mr. Sowers. Yet Captain Molly, a white male, gave the sit-in Captain position to Mr. Sowers over Mr. Watts. Mr. Sowers was thus made to be Mr. Watts' superior officer.

30. That day, Mr. Sowers was preparing to make lunch for the crew. Mr. Sowers approached Mr. Watts and stated, "I know you have a stomach disease and can't eat pork, but it's

okay if you eat turkey burgers, right?" Mr. Watts confirmed that he could eat burgers made from turkey. Mr. Watts offered to help Mr. Sowers prepare lunch, but Mr. Sowers declined.

31. It is custom and practice that firefighters contribute money every shift for the food they share. Those working an overtime shift generally pay a significantly larger share because they are being paid more for their time. Because Mr. Watts was working overtime, he gave more money for these turkey burgers than anyone else to Mr. Sowers.

32. When lunchtime came around, Mr. Watts asked Mr. Sowers if all of the burgers were turkey burgers. Mr. Sowers replied that all the burgers were identical burgers made of turkey. Mr. Watts began eating the burger. After Mr. Watts had finished about half of the burger, another Black firefighter who abstains from eating pork accused Mr. Sowers of combining ground pork into what Mr. Sowers had repeatedly assured Watts were burgers made strictly of turkey. Mr. Watts then directly asked Mr. Sowers if he mixed ground pork into the turkey burgers. With a smirk on his face, Mr. Sowers confirmed that he had indeed mixed ground pork into the burgers. In disbelief, Mr. Watts immediately reacted by stating to Sowers, "You asshole. You put pork in these. I'm not paying for these." Sowers replied, "You already did." After confirming he had intentionally served pork to Mr. Watts and had attempted to do the same to another Black firefighter, Sowers stated to Mr. Watts and the other Black firefighter, "It's in y'all's heads."

33. Mr. Watts sat silent at the lunch table, just beginning to process the anger, betrayal and fear of the impending damage to his body. He thought about how Sowers hadn't let him into the kitchen to help prepare the meal. How Sowers told Watts the burgers were all turkey and all the same. The malicious nature of Sowers' intentional act and the smirking pleasure he derived from harming Watts. He began to think it was also a racial targeting, as there are several Black members of Station 13 who do not eat pork, the two people Sowers targeted were the only black members on duty, and Sowers' words charged with animus, "It's all in y'all's heads."

34. On information and belief, Mr. Sowers also poisoned Mr. Watts because he believed Mr. Watts was Muslim, belonged to the Nation of Islam, or associated with members of those religious communities. This motivation has not only been stated by CCSF's own Chief of Staff at the time, Ms. Sims (which is detailed further below), but there is a fairly high proportion of Black

Muslim or Nation of Islam firefighters within CCSF who generally do not consume pork. During free time in the common area, often while Mr. Sowers was in the room drinking coffee or watching the news, Mr. Sowers observed Mr. Watts reading *The Afterlife of Malcolm X*, *Making Malcolm*, *Black AF History*, *Blood Brothers: The Fatal Friendship Between Muhammad Ali and Malcolm X*. Mr. Sowers also observed Mr. Watts wear shirts depicting Malcom X, Muhammad Ali, and the Marvel character Black Panther. On multiple occasions when Mr. Sowers observed Mr. Watts reading these books and wearing this clothing, Mr. Sowers would turn red and would glare in anger at Mr. Watts. On information and belief, Mr. Sowers interpreted Mr. Watts's race, abstention from pork, reading, and clothing as indications that he was Muslim, belonged to the Nation of Islam, or associated with those communities. That perceived religious identity or association substantially motivated his decision to conceal pork in Mr. Watts's food. Mr. Sowers used the same act to target Mr. Watts's perceived religious restrictions and exploit his known disability to cause physical harm. His racial and perceived religious animus operated together.

35. Within hours of eating the burger, Mr. Watts developed sharp abdominal pain and repeated diarrhea. He spent the remainder of his shift rushing to the bathroom, then hurrying to clean himself and respond to medical calls. He could not eat dinner. He continued working overnight and into the next morning, while the pain and repeated trips to the bathroom kept him awake. Mr. Sowers knew that Mr. Watts had become ill after eating the food he had prepared. He said nothing.

36. The suffering continued after Mr. Watts returned home and grew worse over the next two days. It felt like a rock moving through his intestines, producing sharp, wrenching cramps as it scraped through. His abdomen bloated and he was so hungry but could not tolerate food and struggled to keep anything down, trying instead to sustain himself with liquids. The intense pain kept him awake. As his symptoms worsened, he repeatedly considered whether he would need to return to the hospital. Only by the fourth day had the symptoms subsided enough that he felt capable of returning to work.

37. Mr. Watts describes the pain as worse than being repeatedly punched in the stomach. He knows the difference: the pain of a punch recedes. This was a worse pain that persisted, with

continuous sharp cramps day and night. He would have preferred repeated punches. By deliberately triggering Mr. Watts's disease, Mr. Sowers inflicted pain that Mr. Watts experienced as more severe and enduring than repeated physical blows.

38. This act by Sowers was either an act of intentional violence (i.e., intentional poisoning) or a conscious disregarding of Mr. Watts' safety carried out through deliberate deception. Mr. Sowers knew (or at least was informed) precisely how to cause Mr. Watts physical suffering because Mr. Watts had explained it to him, repeatedly and in detail. Mr. Sowers then concealed the known trigger in his food and induced Watts to eat it. He used Mr. Watts's disability as the means to injure him.

39. Mr. Sowers carried out this act while serving as the commanding officer on duty—the officer entrusted with the safety of the firefighters under his command. Mr. Watts relied on his superior officer's express assurance that the burgers contained only turkey. Mr. Sowers exploited that trust to feed him pork, knowing that Mr. Watts told him that it could cause severe illness and hospitalization. When Mr. Watts discovered what he had done, Mr. Sowers smirked. The deception took moments. The physical suffering lasted four days.

**D. SFFD officers pressure Watts not to document or further report the poisoning.**

40. On his first day back to work after his Crohn's disease flare up, Mr. Watts informed his supervisor, Lieutenant Robert McDonald, of all material details surrounding his poisoning by Defendant Sowers. Lieutenant McDonald told Mr. Watts that the 3807 was the correct type of injury report to use, but also said to "keep my name out of it." That supervisor did not report or otherwise document Mr. Watts' poisoning.

41. Mr. Watts completed the injury report. Before submitting the report, he informed Station 13 Captain Molloy of all material details surrounding his poisoning by Defendant Sowers and that he was going to submit the 3807 report of the incident. Captain Molloy immediately attempted to downplay the situation to Mr. Watts, saying, "What if it was a joke?" Captain Molloy also stated that he wanted to keep the incident "in house" and prevent Mr. Watts from documenting the incident and reporting it beyond Station 13. Captain Molloy was attempting to bury the incident and shield Defendant Sowers from facing disciplinary repercussions. In a last-ditch attempt to

prevent Mr. Watts from filing the report, Captain Molloy said, "We're not gonna be able to keep it in house if you document it."

42. Mr. Watts submitted the injury report through official SFFD channels on March 9, 2024. Battalion Chief Richard Gering called Mr. Watts and told him that he should elevate the matter to an Unusual Occurrence report. While Mr. Watts was on the phone with Chief Gering, Mr. Sowers walked into the room in an effort to listen in and interrupt the call. Mr. Watts moved to another room in order to get away from Mr. Sowers and complete the report.

43. Battalion Chief Ethan Jackson directed Captain Molloy to investigate whether any SFFD Rules had been violated surrounding Mr. Sowers' actions against Mr. Watts. Molloy thus bore responsibility for investigating the same incident he had urged Mr. Watts to keep "in house."

44. On or about March 12, 2024, Captain Molloy, along with Captain Joe Chan and Mr. Sowers, approached Mr. Watts when he was alone in the front of the apparatus bay of Station 13. The two Captains claimed that Mr. Sowers wanted to apologize to Mr. Watts. Mr. Sowers said, "Sorry, I forgot" regarding Mr. Watts' Crohn's disease and inability to eat pork.

45. Mr. Watts immediately challenged that explanation, stating again that just before preparing the meal, Mr. Sowers had expressly acknowledged that Mr. Watts had a stomach disease and could not eat pork. He also reiterated that after Mr. Watts discovered the pork, Mr. Sowers had dismissed his medical restriction—"It's in y'all's heads"—and refused to return his money. Mr. Watts was recounting these facts to make clear that Mr. Sowers had acted intentionally.

46. Captain Molloy interrupted him. The captain whom Battalion Chief Ethan Jackson had directed to investigate whether Mr. Sowers violated SFFD rules cut off Mr. Watts to stop his explanation of why the poisoning could not have been an accident. "You guys are two of the best firefighters I have here," Molloy said, "but part of being a good firefighter is squashing stuff like this. Can I get you guys to shake hands?" Captain Chan nodded in agreement with Molloy. Molloy thus tied Mr. Watts's standing as a good firefighter to his willingness to put aside an intentional act that had caused him four days of physical suffering. Caught off guard and under pressure from his superior officers, Mr. Watts reluctantly shook Mr. Sowers's hand. He still expected the department to investigate and hold Mr. Sowers accountable.

47. Captain Molloy then turned to the official record. “Can we get you to put that Sowers apologized and you two shook hands in the paperwork,” he said. Molloy stood over Mr. Watts’s shoulder at a fire station computer and directed him to alter his report to state: “Firefighter Sowers states that he forgot about my dietary restriction and it was not malicious.”

48. When Mr. Watts explained why Mr. Sowers’s conduct could not have been an accident, Captain Molloy interrupted him and urged him to “squash” the matter. Molloy then stood over Mr. Watts as he directed him to add Mr. Sowers’s claim of forgetfulness and lack of malice to the official report. The captain assigned to investigate the poisoning used his authority to secure language that would help excuse it. Molloy urged silence, interrupted Watts’s explanation of intent, and then used his supervisory authority to shape the official account in Sowers’s favor.

49. Mr. Watts received a call from Battalion Chief Jackson, who is Black and who also does not eat pork. Chief Jackson informed that Assistant Chief Kenneth Yee had directed him to tell Watts to write in the Unusual Occurrence report whether he would be filing an EEO complaint with CCSF human resources because Yee said SFFD would be able to hold Watts to it. Chief Jackson told Mr. Watts not to follow Assistant Chief Yee’s directive, indicating that this was an SFFD attempt to limit Watts’ avenues for accountability. Chief Jackson also said that he had problems with Mr. Sowers before. At Chief Jackson’s direction, Mr. Watts wrote in the Unusual Occurrence report that Chief Jackson had advised of the option to report to make an EEO complaint with HR.

### E. SFFD rejects the discrimination basis identified by its investigator and leaves Watts unprotected.

50. The material facts surrounding Mr. Watts’ report of poisoning and the immediate physical harm quickly reached at least as high as the second in command of the entire SFFD at that time, Deputy Chief of Operations Darius Luttropp.

51. Deputy Chief Luttropp, who was in command of SFFD internal investigations, assigned Battalion Chief Pierre Francois to investigate Mr. Watts’ allegations. Battalion Chief Francois is Black. On information and belief, Chief Francois took recorded interviews of witnesses, including Mr. Watts.

52. SFFD never provided Chief Francois' report to Mr. Watts.

53. After waiting for over three and a half months for SFFD to take some form of action and being required to routinely work with Mr. Sowers and under the supervision of Captain Molloy during this wait, the SFFD command finally spoke. On June 20, 2024, SFFD Human Resources Director Jesusa Bushong sent Mr. Watts a letter addressing his complaint. The letter began: "I received a report from Battalion Chief Piere [sic] Francois by email today regarding your allegation that FF Sower [sic] intentionally put pork in your food, which caused a four-day flareup in your medical condition." It was clear from Ms. Bushong's statement that Chief Francois had generated a report regarding the findings of the investigation. Ms. Bushong continued, "It appears from Chief Francois' report that *he was the one* who identified the discrimination theory of harassment-hostile work environment." Mr. Sowers' actions—and potentially others' actions against Mr. Watts—led Chief Francois to generate a report identifying discrimination as a motive for the harassment subjected upon Watts.

54. The remaining substance of the letter reveals HR Direct Bushong's intent to wrongfully shut down any theory of discrimination and circle the wagons at the expense of Mr. Watts' safety and wellbeing. Bushong wrote, "For your information, the standards for a finding of harassment (Hostile Work Environment) under discrimination laws are the complainant is subject to physical, verbal, or visual conduct on account of the complainant's membership in a protected category; and the conduct is unwelcome." Bushong concluded on behalf of the SFFD: "Based on the incident and claim above, I was not able to identify a protected category under discrimination laws for to [sic] support hostile work environment." Bushong rejected the discrimination theory because she purportedly could not identify a protected category—even while acknowledging that the reported conduct had triggered what Bushong characterized as ""a four-day flareup in [Mr. Watts's] *medical condition*."

55. HR Director Bushong's letter did not address whether Mr. Sowers had intentionally fed pork to Mr. Watts; her only mention of Mr. Sowers' actions were merely that they were "alleged." She did not address whether Sowers or any others had violated SFFD rules and

regulations. She did not conclude or even insinuate that Sowers had done anything wrong at all. The SFFD made no offer to take any measures to protect Watts.

56. Rather than allow obvious and necessary findings of serious SFFD rules violations punishable by termination, of which there were numerous such rules violated—Bushong raised the bar from an easy determination that Sowers violated SFFD rules to an unnecessary requirement that statutory harassment must be established to find wrongdoing. This was a transparent effort to protect the SFFD administration by protecting Sowers and leaving Mr. Watts unprotected against the impunity of someone who maliciously poisoned him at work.

57. HR Director Bushong's letter amounted to the SFFD's official codification of their internal position that no matter the weight of the evidence against Sowers, they would suppress it. They would reject the findings of the Black lead investigator without basis. They would protect the wrongdoer to protect the SFFD administration. And they would send the message from the highest command level of the SFFD to a line firefighter that they wouldn't lift a finger when a White commanding officer intentionally poisoned a Black firefighter due to his disability and his race. Through HR Director Bushong, the SFFD overrode the findings of Chief Francois—the investigator on the ground—to purposefully turn a blind eye in order to protect Mr. Sowers and SFFD from consequences for his unlawful misconduct. Mr. Sowers would thus be intentionally shielded from consequences by one of the highest-ranking officials in the SFFD.

58. Mr. Sowers deliberately used Mr. Watts's disability to inflict four days of excruciating pain. Bushong's letter acknowledged the medical condition that Mr. Sowers had exploited, then professed an inability to identify a protected category. The contradiction appeared on the face of the letter. Her stated reason for rejecting discrimination was a pretext: the department purported not to recognize the disability that its own Human Resources Director had just described as the source of Mr. Watts's reported injury. By shielding Mr. Sowers from accountability, the SFFD protected itself at Mr. Watts's expense and left him in the crosshairs of a man who knew how to hurt him—and now had reason to believe his superiors would protect him afterward. Mr. Sowers continued preparing meals at the firehouse. Mr. Watts stopped eating anything his coworkers prepared, afraid that someone would again use his disease against him.

59. The SFFD refused to discipline Mr. Sowers, and as a direct result allowed him to continue his harassing and discriminatory behavior toward Mr. Watts.

**F. With SFFD protecting Sowers, he directs racial abuse at Watts, and another SFFD chief discourages a formal report.**

60. After Christmas 2024 had passed, Mr. Watts began tidying up Station 13. In this process, Mr. Watts started to take down Christmas decorations. Mr. Sowers entered the room and angrily asked, "Why are you taking down the Christmas decorations?" Mr. Watts replied that it was because Christmas was over. Mr. Sowers shouted in reply: "**We don't take down y'all's decorations during fucking Black History Month in February**."

61. Mr. Watts immediately reported this incident to Lieutenant Eli Thomas. Mr. Watts asked Lieutenant Thomas to formally report and document the incident. Lieutenant Thomas was aware of Mr. Sowers' past misconduct, including that already detailed. Lieutenant Thomas contacted Battalion Chief David Thompson. After doing so, Lieutenant Thomas started bargaining for Mr. Sowers. Instead of documenting the incident, he asked Mr. Watts if he could "hypothetically" arrange an outcome where they kept the incident within the Company (Station 13) and there would be no documentation of the incident. Watts told him no, he wanted this documented.

62. Chief Thompson then arrived. He spoke to Lieutenant Thomas, Mr. Sowers, and Mr. Watts separately. Mr. Watts shared all of the material details about the incident that had just transpired with Mr. Sowers, including the witnesses to the incident. Chief Thompson told Mr. Watts that he was aware of the "history" between Mr. Sowers and Mr. Watts. Mr. Watts asked if he and Chief Thompson could complete an Unusual Occurrence report to document the incident and get witness statements from the two witnesses to the incident that had just transpired. Chief Thompson said, "I'm *Chief* Thompson. I'm not your friend or buddy. This is business." He then told Mr. Watts, "No," he would not permit any Unusual Occurrence report of the incident and would not interview witnesses.

**G. Watts reports the SFFD's unlawful actions surrounding the Sowers incidents to CCSF's HR Department.**

63. On December 30, 2024, Mr. Watts emailed CCSF's Department of Human Resources Equal Employment Office Division ("CCSF HR") with a formal complaint regarding SFFD's unlawful actions against him. Once submitted, Mr. Watts had to wait for an interview with CCSF HR staff and the creation of a formal "Charge of Discrimination" document to be produced by CCSF HR staff.

64. In the meantime, on March 4, 2025, when nothing at all had been done to address or discipline Mr. Sowers within the SFFD for his discriminatory and abusive behavior, Mr. Watts received a call from a new SFFD investigator, Captain Zackary Tibbits. Though Mr. Watts was off work on vacation that day, Captain Tibbits informed him that it was critical that he come in to work for an interview that very day to "complete" the investigation into Mr. Sowers. In the SFFD, there is a one-year time limit for the department to take disciplinary actions against firefighters and the one-year anniversary of the incident in which Mr. Sowers maliciously served Mr. Watts pork, flaring his Crohn's disease symptoms, was literally the next day.

65. By conducting a new interview in the span of one day after having already been repeatedly interviewed by Chief Francois and after Chief Francois had completed his own investigation revealing a "theory" of discrimination and harassment (as Ms. Bushong put it), it appears SFFD simply did not like the report of the investigation produced by Chief Francois, and decided to conduct a new investigation that would be favorable to the perpetrator, Mr. Sowers.

66. Despite the fact that he knew another interview was unnecessary and would be conducted while he was off work on vacation, Mr. Watts still went in for the interview. The interview was conducted by Captain Christopher Bonn. During the interview, Mr. Watts asked Captain Bonn why he needed to be interviewed again. Captain Bonn could not give a reason that a second interview needed to be conducted, saying only, "this just landed on my desk." Mr. Watts explained, yet again, material details of the incident in which he was deceptively and maliciously served pork by Mr. Sowers, emphasizing that this conduct was discriminatory. During the interview, Mr. Watts also attempted to bring up the incident involving Christmas decorations because that situation also involved discriminatory harassment by Mr. Sowers. Captain Bonn would not allow Mr. Watts to discuss the incident at all, saying that it was a "separate incident".

Captain Bonn's line of questioning also carefully avoided all discussion of discrimination, whether regarding disability, race, or religion. After this interview, Mr. Watts received no updates on the conclusion of the new investigation.

67. In a subsequent recorded interview of Mr. Watts by CCSF HR staff member Alexandria Mullins. During the interview, Ms. Mullins invoked other Black firefighters who, she claimed, considered Mr. Sowers a "nice guy," and pressed Mr. Watts to speak favorably about him on the recording. By emphasizing those firefighters' race, Ms. Mullins used their purported approval to cast doubt on Mr. Watts' allegations and pressure him to soften his account of the discrimination and physical harm he had suffered. Mr. Watts had come to CCSF HR to report specific acts of harm. The investigator responded by invoking other Black employees to vouch for the man he had reported.

68. Whether Mr. Sowers had treated other Black firefighters well did not answer whether he had deliberately poisoned Mr. Watts or subjected him to racial abuse. Yet Ms. Mullins pressed the person reporting that misconduct to praise Mr. Sowers on the recording. Mr. Watts had already faced pressure from SFFD officers to "squash" the poisoning and leave subsequent racial abuse undocumented. Now, in another CCSF office to which he had turned for help, he again had to defend the legitimacy of his complaint while resisting pressure to provide an account that would help protect the man he had reported.

**H. Due to Sowers's unobstructed and ongoing mistreatment of Watts, Watts is forced to request a transfer out of Station 13.**

69. Mr. Watts had spent most of his firefighting career at Station 13. He worked, ate, and slept there alongside firefighters whose lives depended on one another. It was his second home. After the poisoning, returning to that home meant having to live with a person who had deliberately caused him four days of excruciating pain—and work under the officers who had protected that man when Mr. Watts sought help.

70. Mr. Watts tried to remain. He kept his distance from Mr. Sowers, brought his own food, and continued performing his duties while pursuing formal complaints through SFFD and CCSF. But those precautions could not restore his sense of safety. The SFFD neither disciplined

Mr. Sowers nor instituted any corrective measures to address his misconduct. Mr. Watts still had to spend days and nights in the same station as Mr. Sowers, afraid that another deliberate exposure could trigger a severe, potentially fatal flare of his Crohn's disease. The department's response compounded that fear. By excusing the poisoning and pressuring Mr. Watts to minimize it, leadership sent Mr. Sowers the message that he could harm Mr. Watts with impunity. Mr. Sowers then subjected Mr. Watts to further racist abuse. When Mr. Watts reported that conduct, another commanding officer refused to permit a formal report or interview the witnesses. Each incident reinforced Mr. Watts's fear that leadership's protection had given Mr. Sowers permission to continue.

71. With CCSF's silence and permissive approach to Sowers, the harassment continued. As Mr. Watts reported to CCSF HR and Chief Crispen, a poster naming FF Sowers "Employee of the Year" was prominently displayed for months at Station 13. One flyer described his pork-laced burgers as "infamous Alamo burgers… a mix of turkey, onion, and cheese that somehow still taste like pork." This poster was known and condoned by Station 13 leadership and every high-ranking official who saw it.

72. From before the March 2024 poisoning through August 2025, Mr. Sowers routinely turned on the news in Station 13's common room and loudly ranted about stories involving Black people allegedly committing crimes or diversity, equity, and inclusion. He focused on the Black firefighters present, including Mr. Watts, and used expressions such as "here we go again," "your people," "you people," and "those people" while disparaging the Black people featured in the broadcasts.

73. The continuing fear, anxiety, isolation, and harassment made remaining at Station 13 intolerable. Without discipline or corrective action against Mr. Sowers, Mr. Watts had no reason to believe that the misconduct would stop or that the department would protect him from another attack. In August 2025, was forced to put in for a transfer from his home station to escape conditions he could no longer endure. He gave up the station where he had built most of his career because the SFFD's refusal to discipline Mr. Sowers or take corrective action left him unable to remain there safely.

74. Mr. Sowers remained at Station 13. The firefighter who had deliberately inflicted the harm kept his place without discipline or corrective action. The firefighter who reported it bore the disruption and loss of leaving. By protecting Mr. Sowers while denying Mr. Watts protection, the department forced Mr. Watts to surrender the place he had called home to get away from the man who had harmed him.

**I. Chief Dean Crispen**

75. With inaction and obstruction by CCSF since his first report of Sowers poisoning him in March 2024 and continued inaction and gaslighting by CCSF HR since his report of ongoing racial harassment in December 2024, Mr. Watts made another attempt to stop this ongoing harm. With the hope of doing so and to remain at Station 13—he had put in for a transfer upon his return from paternity leave in November 2025—on August 25, 2025, Mr. Watts wrote a letter directly to the highest-ranking official in the SFFD, Chief Dean Crispen. Mr. Watts also copied CCSF HR Director Carol Isen and the SFFD Fire Commission. With the subject: "Formal Complaint Regarding Adverse Employment Actions, Hostile Work Environment, Harassment, Obstruction of Whistleblowing Rights and Administrative Negligence", Mr. Watts gave the material details of harassment he suffered because of Mr. Sowers, as well as the actions of multiple officers—including Captain Molloy (whom had since been promoted to Battalion Chief), Lieutenant Thomas, and Battalion Chief Thompson—to protect Mr. Sowers and cause Mr. Watts to be subjected to ongoing discrimination and harassment. Mr. Watts also addressed Chief Francois' investigatory findings that identified the harassment, hostile work environment, and discrimination Watts was subjected to, after which SFFD removed Chief Francois from the case. Finally, Watts also raised HR Director Bushong's baseless dismissal of Chief Francois' findings and her blatantly false contention that Mr. Watts' protected disability was not a "protected category", so he was not discriminated against. Mr. Watts requested that Chief Crispen provide a formal response on how the SFFD would address "the misconduct, physical harm, and other damages I suffered caused by a fellow firefighter and supervising officers", as well as "[a]n assurance that whistleblower protections will be enforced and that no firefighter will be silenced for speaking up." Mr. Watts also requested access to the recordings of interviews he participated in.

76. Chief Crispen responded to Mr. Watts' letter by calling Watts on his personal cell phone while he was on paternity leave and stating that he wanted any discussion about the substance of Mr. Watts' complaints to be in person, not over the phone or over email. Chief Crispen thus ensured it was a very brief call. On September 3, Mr. Watts emailed Chief Crispen, stating: "As you mentioned meeting in person, I want to note that I am currently on leave and my wife is due to give birth at any time, so I may soon be on baby leave as well. Given those circumstances, I would prefer to handle communications by email for now." Mr. Watts further wrote, "it is important that all discussions regarding my complaints are fully documented for transparency. To that end, I request that the department provide, in writing: An agenda for the proposed meeting" and a "detailed update on what has occurred in the investigation process so far, including actions taken and the status of pending matters."

77. On September 5, Chief Crispen responded via email, stating cryptically: "Here is a summary of the investigations you referred to in your first correspondence. First investigation regarding the food served has been adjudicated[.] Second investigation is still ongoing and is nearing a final investigative report that will be submitted to me. EEO complaint is in the hands of DHR. Unclear as to the status." Regarding an agenda for an in-person discussion, Chief Crispen clarified that the discussion would not address the ongoing harassment Mr. Watts had faced or any remedy. Instead, Crispen would talk about "the current state of the department", "current projects the department is working on," and "My vision of where I want to see the department in coming years."

78. Chief Crispen would not allow any substance surrounding CCSF's treatment of Mr. Watts' to be documented and thus required that any discussion must be in person. However, as he made clear on September 5, Crispen would not allow an in-person discussion to delve into the ongoing "misconduct, physical harm, and other damages [Watts] suffered caused by a fellow firefighter and supervising officers", nor would Crispen even provide "[a]n assurance that whistleblower protections will be enforced and that no firefighter will be silenced for speaking up." Crispen made clear that all Watts would get from the SFFD regarding a violent poisoning and its cover up was: "First investigation regarding the food served has been adjudicated"— a watering

down of serious violence and a refusal to address the result of the purported investigation or how SFFD would prevent this violence from recurring. Chief Crispen thus refused to engage in writing, over the phone, or in person regarding the serious ongoing harm committed against Watts by his coworkers, direct supervisors, and the highest levels of the department. All levels of the SFFD stonewalled Watts, refusing to document the facts and covering up the wrongdoing to protect Sowers and themselves.

79. The following day, Mr. Watts and his wife attended an SFFD Chili Cookoff. Mr. Watts' wife noticed Chief Crispen staring at him. Crispen approached Watts and asked about the pregnancy and when his wife was due. Crispen then walked away without a word about Watts's inability to safely return to Station 13 after paternity leave.

**J. Crispen's Chief of Staff**

80. Two days after Crispen shut down Watts' efforts to ensure accountability and safety in the workplace, Mr. Watts was contacted by the Chief of Staff to Chief Crispen: Adrienne Sims. Mr. Watts previously had a positive relationship with Ms. Sims prior to Chief Crispen creating the Chief of Staff position and appointing Ms. Sims. Ms. Sims acknowledged Mr. Watts was on leave for the impending birth of his child but asked if they could meet up and talk. Given their prior interactions, Mr. Watts thought they were meeting just to have an informal catch up.

81. On September 8, Mr. Watts met with Ms. Sims. After a few niceties regarding Mr. Watts' soon-to-be-born child, Ms. Sims delved into the real reason she was there: to intimidate Mr. Watts—on behalf of Chief Crispen—from taking legal action against the SFFD and CCSF for their wrongdoing. Ms. Sims began by stating that Chief Crispen mentioned he saw Mr. Watts at the SFFD Chilli-Cook-Off event, making clear she had spoken to Crispen about Watts within the last day. Ms. Sims brought up firefighter Larry Jacobs, a Black firefighter who had recently received seven-figures in damages after a jury found that SFFD had racially discriminated and retaliated against him. Ms. Sims stated that "the department would be better off if there weren't people like Larry Jacobs still in the department." Ms. Sims brought up other legal actions against CCSF, saying "This isn't back in the day when the department would just pay off these people suing the city. Otherwise, I wouldn't want to work here anymore." Ms. Sims said SFFD employees

suing the city wouldn't "just get paid out," making it clear that the position of the SFFD and CCSF is to fight lawsuits with fierce opposition regardless of their merit, all in a thinly veiled attempt to intimidate Mr. Watts into not seeking a legal remedy to the discrimination, harassment, and retaliatory intimidation he continued to suffer.

82. Adding threats of more direct consequences to her monologue, "trust me, you don't want to be on Chief Dean's radar." Ms. Sims was well-aware Mr. Watts had complained directly to Chief Dean, and that Mr. Watts himself was now clearly "on Chief Dean's radar," which is a place "you don't want to be." Ms. Sims also discussed the importance of not letting coworkers "get under your skin" because doing so would put your "career in jeopardy."

83. Ms. Sims did, however, state that she believed Mr. Sowers put pork in Mr. Watts's food because he believed Mr. Watts was Muslim.

84. Days later, Chief Crispen's intimidation and condonation of the ongoing nightmare Mr. Watts was forced to endure at work hung like a dark shadow over the birth of his first child. At a time when he should have been free to absorb the life-changing love of his newborn boy and take care of his wife as she recovered from labor, Watts' thoughts were overrun by the knowledge the leader of the SFFD was engaging in the same ongoing pattern of intimidation and retaliation he had faced from his other commanding officers in their effort to circle the wagons in support of the man who had poisoned and abused him. It was now clear to Watts that he likely had no choice but to transfer out of Station 13 for his self-preservation upon his return from maternity leave in November 2025, although he still held out some hope, given CCSF's repeated promises (as is detailed further in Section L. below), that Sowers would at least be disciplined for his conduct.

**K. CCSF HR's final determination regarding Sowers' ongoing discrimination and harassment.**

85. On December 4, 2025, the CCSF HR Director Carol Isen issued Watts a determination letter regarding Sowers' March 2024 poisoning and December 2024 racial harassment. Regarding these incidents, Ms. Isen wrote, "there was sufficient evidence to substantiate that Sowers subjected you to conduct related to disability, race, sexual orientation, and gender identity or

expression that would violate the City's EEO Policy and the City's Equitable, Fair, and Respectful Workplace Policy."

86. However, Ms. Isen did not address whether any corrective action would be enacted against Sowers. She did not address how CCSF would protect Mr. Watts from future violence, discrimination, harassment, or retaliation. Moreover, Ms. Isen ignored entirely Mr. Watts' reports of retaliation, witness intimidation, and ratification of Mr. Sowers' admittedly unlawful conduct.

**L. CCSF promises accountability while protecting Sowers and the officers who targeted Mr. Watts.**

87. As Mr. Watts pursued relief through SFFD and CCSF, officials repeatedly assured him that their investigative processes would address the misconduct. On June 20, 2024, HR Director Bushong wrote: "Please be assured that the Department and the City take these matters seriously and will handle the matter appropriately." Mr. Watts relied on that assurance and continued pursuing internal relief. In March 2025, Captain Tibbits informed him that another interview was necessary to complete the poisoning investigation. Mr. Watts attended while on vacation and repeatedly supplied information, participated in interviews, and requested investigative results, recordings, and protection against further misconduct.

88. Throughout this process, Mr. Sowers continued the racial harassment that had preceded and motivated the poisoning. From before the March 2024 attack through August 2025, Mr. Sowers routinely turned on the news in Station 13's common room and loudly ranted about stories concerning Black people allegedly committing crimes or diversity, equity, and inclusion. He focused on the Black firefighters present, including Mr. Watts, and used expressions such as "here we go again," "your people," "you people," and "those people" while disparaging the Black people featured in the broadcasts.

89. From January through August 2025, displays at Station 13 named Mr. Sowers "Employee of the Year" and celebrated his "infamous Alamo burgers"—"a mix of turkey, onion, and cheese that somehow still taste like pork." The displays turned the means of Mr. Watts's physical injury into a continuing source of public humiliation. Station leadership knew of and allowed the displays. Mr. Watts reported them to Ms. Mullins and Chief Crispen. While CCSF

prolonged its investigations, Mr. Watts continued enduring racial abuse from the same firefighter whose conduct he had reported.

90. Mr. Watts sought intervention from Chief Crispen and requested written responses, investigative information, and assurances against retaliation. Chief Crispen resisted documenting a substantive response to those requests, and CCSF refused to provide the requested recordings of Mr. Watts's investigative interviews. On September 5, 2025, Chief Crispen stated that another investigation remained ongoing and was nearing a final report, and indicated that the EEO complaint remained with CCSF HR.

91. On September 24 and 25, 2025, Ms. Sims sent Mr. Watts text messages representing that Mr. Sowers was receiving a ten-day suspension and a transfer out of Station 13. She also represented that he had received a three-day suspension for the poisoning. These representations were false. Mr. Watts nevertheless relied on them during his paternity leave, believing that the department was finally imposing consequences and that Mr. Sowers would no longer be at his home station when he returned.

92. In November 2025, as he prepared to return from leave, Mr. Watts learned that Mr. Sowers had not transferred. The promised separation had not occurred. Returning to Station 13 would still require him to work, eat, and sleep alongside the man who had poisoned and racially harassed him, under officers who had protected that man and pressured Mr. Watts against seeking accountability. Mr. Watts therefore proceeded with his own transfer upon returning from paternity leave. Mr. Sowers retained his place; Mr. Watts surrendered the station where he had spent most of his career.

93. But Mr. Watts still had hope because CCSF renewed its assurance of corrective action. In her December 4, 2025 determination substantiating violations of City policies, HR Director Isen wrote: "This investigation is now considered closed. Please be advised that I will direct that appropriate action be taken regarding Sowers' conduct and his violations of these City policies." Mr. Watts relied on that express commitment. Although the investigation had closed, CCSF represented that action addressing the substantiated misconduct would follow.

94. Mr. Watts relied on CCSF's repeated representations that its investigations would address the misconduct, that Mr. Sowers faced discipline and transfer, and that appropriate corrective action would follow. He continued cooperating with the investigations and requesting information because officials repeatedly represented that the department would address his complaints. CCSF withheld the investigative information he requested while assuring him that accountability was forthcoming. Only in early 2026 did he learn that the disciplinary consequences Ms. Sims had described had not occurred and that CCSF had taken no corrective action against Mr. Sowers or the officers who had harmed Mr. Watts while protecting him.

95. Mr. Watts presented his Government Claims Act claim in April 2026. Even then, he hoped that formally detailing the poisoning, continuing racial harassment, and officers' misconduct would finally prompt CCSF to act. CCSF rejected the claim on May 27, 2026.

96. As of the filing of this complaint, CCSF has imposed no discipline or corrective action against Mr. Sowers or the officers who harmed Mr. Watts while protecting him. Mr. Watts has repeatedly confirmed that continuing inaction. The department's assurances led him to await accountability; its conduct left Mr. Sowers protected and Mr. Watts displaced.

**M. The poisoning and CCSF's response leave Watts living and working in fear.**

97. Mr. Sowers used Mr. Watts's disability to inflict four days of excruciating pain. The physical suffering eventually subsided. The fear did not. Mr. Watts knew from previous episodes what a severe flare of his Crohn's disease could do to him: agonizing pain, gastrointestinal bleeding, profound weight loss, and days in the hospital. His gastroenterologist had warned him that a flare could kill him. Mr. Sowers had shown how easily a coworker could expose him to that danger through food he believed was safe.

98. The SFFD's response deepened that fear. Officers urged Mr. Watts to "squash" the poisoning, pressed him to include language excusing Mr. Sowers in his report, and refused to document subsequent racial abuse or interview witnesses. Their racially motivated protection of Mr. Sowers left Mr. Watts feeling that his safety mattered less than shielding the white firefighter who had harmed him. For Mr. Watts, leadership's response was the greatest betrayal. He feared

that officers would again protect Mr. Sowers if he harmed him—and that Mr. Sowers knew it. Their protection made the man who had poisoned him feel more dangerous, not less.

99. At Station 13, even the food Mr. Sowers had used to injure him became material for public mockery. Displays celebrated Mr. Sowers and his pork-laced burgers while he continued directing racist rants at Black firefighters. Mr. Watts had endured days of pain after eating that food. His coworkers turned that suffering into a joke, reinforcing his humiliation and fear that someone else might "test" his disease while officers looked on.

100. Mr. Sowers continued preparing meals at Station 13 after the poisoning. Mr. Watts stopped eating anything his coworkers prepared. He brought his own meals and froze food in advance at the firehouse for mandatory overtime. He still prepared meals for the crew, taking the care he would take if cooking for ten people with his own vulnerability. But he could no longer trust anyone else to prepare his food. An ordinary part of firehouse life became a daily reminder of the attack. He lost the companionship of shared meals and feared that another coworker might secretly add a trigger to "test" whether he really had Crohn's disease or whether the consequences were as severe as he said. Ms. Sims's stated belief that Mr. Sowers had targeted him because he thought Mr. Watts was Muslim compounded his fear that another coworker might act on the same mistaken assumption.

101. The loss of trust reached beyond the kitchen. Firefighters live together for days and nights and depend on one another in life-threatening situations. Mr. Watts had to entrust his life to coworkers while fearing deliberate harm inside the firehouse—and knowing that his commanding officers had protected the man who inflicted it. Keeping his distance from Mr. Sowers could not undo the fact that he still had to live and work alongside him. Mr. Watts experienced persistent anxiety, stress, and periods of depression. He no longer felt safe at the firehouse. The attack had taken his peace, dignity, and sense of belonging; the department's response left him wondering what further harm its officers would permit. A reasonable person subjected to that violence, continuing harassment, and institutional betrayal would feel compelled to quit. Mr. Watts felt that same compulsion. But his young family depended on his income. He could not afford to leave the employment that had become a source of fear.

102. The distress followed him home. Days before his son's birth, Chief Crispen's own Chief of Staff warned him against being on "Chief Dean's radar" and putting his "career in jeopardy." Mr. Watts understood those statements as warnings about pursuing his complaints. Fear about his employment and ability to support his family intruded on the birth of his first child and his time caring for his wife and newborn son.

103. The continuing distress also impaired Mr. Watts's performance on examinations for promotion to Lieutenant. After years of working toward advancement in a profession he loved, he feared that the department would punish his complaints by denying him promotion regardless of his qualifications. The officers' warnings made seeking accountability feel incompatible with protecting his career and providing for his family.

104. A psychologist with SFFD's Stress Unit informed Mr. Watts that she had diagnosed him with post-traumatic stress disorder and an anxiety disorder stemming from the conduct of Sowers and the CCSF officials. Mr. Watts began regular therapy, but the distress has persisted. Stress worsens his Crohn's symptoms, and he struggles to maintain a healthy weight. His fear of further physical harm itself takes a physical toll.

105. While transferring stations removed Mr. Watts from daily proximity to Mr. Sowers, it did not restore his trust in the department. CCSF's December 2025 substantiation of policy violations and promise of appropriate action gave him renewed reason to expect accountability. Learning in early 2026 that the represented discipline had not occurred and that CCSF had taken no corrective action deepened his sense of abandonment. Mr. Sowers kept his place. Mr. Watts bore the disruption and loss.

106. Mr. Watts continues working because his family needs his income, not because the conditions became tolerable. He changed stations to get away from Mr. Sowers. He remains dependent on the department that protected Mr. Sowers—and afraid that, if another coworker harms him, its leaders will once again protect the person who hurt him.

## <u>LEGAL CLAIMS</u>

### FIRST CAUSE OF ACTION

### (Battery)

**(Against Defendants Daryl Sowers and City and County of San Francisco)**

107. On March 5, 2024, Daryl Sowers intentionally made harmful and offensive contact with Antoine Watts's body by poisoning him with a known trigger to Mr. Watts' Crohn's disease. At no time did Mr. Watts consent to said contact. A reasonable person in Mr. Watts's situation would have been offended by the contact. As a result of Defendant Sowers's acts, Mr. Watts was in fact harmed and offended by Sowers's contact with Watts's person.

108. Defendant City and County of San Francisco (the "City") is responsible for the wrongful conduct of employee Defendant Sowers as alleged herein pursuant to California Government Code section 815.2 (a).

109. In this case, the City's employee, Defendant Sowers, was acting within the course and scope of his employment when he poisoned Mr. Watts. The poisoning incident and Mr. Watts's injuries as alleged herein resulted from the on-duty conduct of Sowers's performing his job-related duty of cooking meals for coworkers, and did not arise from personal malice unrelated to the employment. Outside of their connection through their employment, Mr. Watts and Defendant Sowers did not know each other or associate at all with each other. Neither had ever been to the other's home nor socialized outside of the workplace in any way whatsoever. The battery arose out of the employment.

110. The SFFD subsequently ratified the poisoning by Defendant Sowers against Mr. Watts. After the poisoning, CCSF immediately learned of the facts surrounding the attack. Mr. Watts shared these material facts in great detail directly with Chief of Department Dean Crispen and many other high-ranking SFFD officials. Other high-ranking officials were aware of the material details of the poisoning, including SFFD HR Director Jesusa Bushong, CCSF HR Director Carol Isen, and Deputy Chief of Operations Darius Luttropp. With this information, the SFFD has failed to properly and fully investigate Defendant Sowers and has taken no steps to punish him, ameliorate the threat he poses, or to redress any of the harm he has done. Instead, the SFFD continues to employ Defendant Sowers at Station 13. By contrast, the SFFD has taken various adverse employment actions against Mr. Watts for reporting Mr. Sowers's violent act. Importantly, numerous separate SFFD supervising officers have pressured Mr. Watts to drop his complaints

against Sowers and have worked to obstruct any documentation, investigation, or accountability. Battalion Chief Daniel Molloy downplayed the poisoning as a "joke" and stated that he wanted to keep the incident "in house" and prevent Mr. Watts from documenting the incident and reporting it beyond Station 13. Chief Malloy used his supervisory authority to shape the official account in Sowers's favor by directing Watts to document Sowers' false apology and standing over Watts shoulders to pressure him to follow the directive. Through HR Director Bushong, the SFFD overrode the findings of Chief Francois—the investigator on the ground—and falsely claim Watts did not fit into any category protecting him from unlawful conduct to purposefully turn a blind eye in order to protect Mr. Sowers and SFFD from consequences for his unlawful misconduct. Sowers knew SFFD had given him a free pass to continue his ongoing harm of Watts, so he did, including by yelling at him, "We don't take down y'all's decorations during fucking Black History Month in February." Lieutenant Eli Thomas bargained for Mr. Sowers, asking to keep it "in house" with no documentation. When that did not work, Battalion Chief David Thompson told Watts he would not permit any Unusual Occurrence report of the incident and would not interview witnesses. Alexandria Mullins made Mr. Watts defend the legitimacy of his complaint as he resisted her pressure to provide an account that would help protect Sowers by her invocation of the purported favorable opinions of other Black firefighters as a reason to discount Mr. Watts's account because he shared their race. With CCSF's silence and permissive approach to Sowers, the harassment continued. Mr. Sowers continued his regularly occurring racist rants in the common areas of Station 13. A poster naming FF Sowers "Employee of the Year" and describing the pork-laced burgers he used to poison Watts as "infamous Alamo burgers… a mix of turkey, onion, and cheese that somehow still taste like pork." This poster was known and condoned by Station 13 leadership and every high-ranking official who saw it and did nothing to remove it. Mr. Watts reported this to Ms. Mullins and to Chief Dean Crispen. Chief crispened then stonewalled Watts, refusing to discuss or document the facts he reported and covering up the wrongdoing to protect Sowers and his administration. Chief Crispen then sent his Chief of Staff—a Black woman—to continue CCSF's intimidation campaign from the highest authority yet, saying: a Black firefighter should not be in the SFFD because a jury returned a verdict against CCSF discriminating and retaliating

against him; "trust me, you don't want to be on Chief Dean's radar;" that he would put his "career in jeopardy" if he let Sowers "get under his skin." Chief Crispen knew this intimidation would be delivered to Mr. Watts while he was taking time off to care for his wife mere days before she was to deliver their first-born child. CCSF forced Mr. Watts out of Station 13 and allowed Defendant Sowers to remain there to this day undisciplined and undeterred. CCSF thus demonstrated their condonation and approval of Defendant Sowers's tortious actions by defending his actions and undertaking a concerted effort to protect him by attempting to silence Mr. Watts.

111. As a direct and proximate result of the unlawful conduct as alleged herein, Mr. Watts has suffered physical injury, severe emotional distress, humiliation, embarrassment, mental and emotional distress and anxiety, economic harm and other consequential damages.

112. The aforementioned conduct by the CCSF and Defendant Sowers was willful, wanton, and malicious. At all relevant times, the CCSF and Defendant Sowers acted with conscious disregard of Mr. Watts's rights and also acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury and/or humiliation to Mr. Watts. Mr. Watts is further informed and believes that CCSF and Defendant Sowers intended to cause fear, physical injury and/or pain and suffering to Mr. Watts. By virtue of the foregoing, Mr. Watts is entitled to recover punitive and exemplary damages.

**SECOND CAUSE OF ACTION**

**(Fraud/Intentional Misrepresentation)**

**(Against Defendants Daryl Sowers and City and County of San Francisco)**

113. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

114. On March 5, 2024, Daryl Sowers represented to Mr. Watts that there was no pork in the burgers he made for Mr. Watts' consumption.

115. That representation was false.

116. Mr. Sowers knew that the representation was false when he made it.

117. Mr. Sowers intended that Mr. Watts rely on the representation.

118. Mr. Watts reasonably relied on the representation.

119. As alleged above, as a direct and proximate result of the unlawful conduct as alleged herein, Mr. Watts has suffered harm (including physical injury, severe emotional distress, humiliation, embarrassment, mental and emotional distress and anxiety, economic harm and other consequential damages) because he ate the poisonous burger in reliance on Sower's representations that the burger was made of turkey, not pork.

120. Defendant City and County of San Francisco (the "City") is responsible for the wrongful conduct of employee Defendant Sowers as alleged herein pursuant to California Government Code section 815.2 (a). The actions of its employees above were within the scope of employment. CCSF also subsequently ratified Defendant Sowers's wrongful conduct as detailed above.

121. The aforementioned conduct Defendant Sowers was willful, wanton, and malicious. Defendant Sowers acted with an intent to deprive Mr. Watts of his right to bodily autonomy and his right to be safe (or at least with a conscious disregard of Mr. Watts's right to be safe), and also acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury, offense, and/or humiliation to Mr. Watts. By virtue of the foregoing, Mr. Watts is entitled to recover punitive and exemplary damages.

**THIRD CAUSE OF ACTION**

**(Negligence)**

**(Against All Defendants)**

122. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

123. Defendant Sowers, as Plaintiff's acting supervisor and the individual preparing his meal, had a special relationship. *See Brown v. USA Taekwondo*, 11 Cal.5th 204, 216 (Cal. Supreme Ct., 2021) ("A special relationship between the defendant and the victim is one that gives the victim a right to expect protection from the defendant."). Defendant Sowers, as the preparer of such meals, also obviously had a plain duty to make sure that what he was offering Plaintiff to eat would not cause him great harm. While Plaintiff obviously alleges intentional theories of battery and fraud, concurrently and in the alternative, Plaintiff also alleges that Defendant Sowers acted

negligently by breaching his duty to provide safe food for Plaintiff and foreseeably causing the injury that he did. Subsequent to Sowers' action, the other Individual Defendants (Malloy and Crispen) also acted negligently, as alleged above and is detailed further below.

124. In addition, the City and County of San Francisco, has a special legal relationship with Plaintiff and Sowers as their employer and, by extension, the agents who carry out this relationship as their supervisors. This special relationship carries with it particular duty to reasonably ensure the safety and welfare of those under employ—*i.e.*, supervisees like Plaintiff. In addition, because CCSF and its agents also have control and authority over their supervisees, they also have a special relationship of control with those employees that comes with a concomitant duty to reasonably ensure those employees do not cause harm to others. *See Brown v. USA Taekwondo*, 11 Cal.5th 204, 216 (Cal. Supreme Ct., 2021) ("A special relationship between the defendant and the victim is one that gives the victim a right to expect protection from the defendant, while a special relationship between the defendant and the dangerous third party is one that entails an ability to control the third party's conduct. **Relationships between** parents and children, colleges and students, **employers and employees**, common carriers and passengers, and innkeepers and guests, **are all examples of special relationships that give rise to an affirmative duty to protect**. The existence of such a special relationship puts the defendant in a unique position to protect the plaintiff from injury. The law requires the defendant to use this position accordingly.") (citations and related marks omitted; emphasis added).

125. Here, CCSF failed both in its duty to protect Plaintiff, as well as in its duty to control and mitigate the violence and discriminatory harassment perpetrated against Plaintiff by Defendant Sowers.

126. CCSF had a duty to exercise ordinary care in its interactions with its employees—including Firefighters Watts and Sowers—and failed to use a degree of care that would have been used by a person of ordinary prudence under the same or similar circumstances by at least (but not limited to—as described above) the following:

- CCSF and SFFD superior officers had a duty to properly supervise its employees, including Firefighter Sowers, so as to reasonably protect co-workers from the aggressive and dangerous propensities shown by Firefighter Sowers based towards his co-workers based upon their protected characteristics. A special relationship exists between employers and

employees, such as between CCSF and Firefighter Watts, giving rise to an employer's duty to protect employees. CCSF was charged with taking all reasonable and appropriate action to address and prevent the aggressive, threatening, and dangerous behavior of its employee toward coworkers and superiors, and it failed to do so.

- SFFD supervisor Sowers concealed a known trigger for Mr. Watts' Crohn's disease in Watts's food and induced Watts to eat it. This was either an act of intentional violence (i.e., intentional poisoning) or a conscious disregarding of Mr. Watts' safety carried out through deliberate deception. Mr. Sowers knew (or at least was informed) precisely how to cause Mr. Watts physical suffering because Mr. Watts had explained it to him, repeatedly and in detail. He used Mr. Watts's disability as the means to injure him.
- CCSF and SFFD superior officers failed to conduct an adequate remedial investigation and discipline against Sowers.
- CCSF and SFFD superior officers failed to support Watts and reprimand other superior officers who were pressuring him not to pursue any remedial action against Sowers and condoning the violence against him when Watts reported such hostile actions.
- CCSF and SFFD superior officers failed to support Watts by causing the submission of reports which were self-serving to CCSF regarding Sowers's poisoning of Watts and the aftermath, preventing an accurate record of conduct by Sowers to aid in his investigation and discipline.
- CCSF and SFFD superior officers failed to protect Watts by appropriately disciplining Sowers in the wake of the poisoning so that Watts was reasonably protected and able to go to work given Sowers's proven poisoning, intimidation and discrimination, which, as a result of this failure, continued after the poisoning.
- CCSF continues to employ Firefighter Sowers knowing his behaviors create a particular risk to others, including Firefighter Watts. CCSF negligently supervises and retains him.
- CCSF and SFFD superior officers failed to properly ensure that the dietary restrictions necessitated by severe allergies were properly addressed through training and other protective measures.
- CCSF failed to implement, enforce, and otherwise promulgate safety policies and procedures.
- CCSF and SFFD superior officers failed to properly train, supervise, and monitor how its employees handled the aftermath of the poisoning on Firefighter Watts, which resulted in retaliation, discrimination, emotional distress, and economic damage to Firefighter Watts.
- CCSF and SFFD superior officers failed to provide Watts with reasonable assurances of his safety and basic well-being, exacerbating his emotional distress and increasing the fear of further poisoning. This failure also led to further discriminatory harassment perpetrated against Plaintiff.

127. Each and all of the foregoing acts (of omission or commission), including those detailed more expansively further above, were negligent and constituted negligence, and were each and all, independently and/or concurrently the proximate cause of the harm to Plaintiff as alleged.

128. As a direct and proximate result of the unlawful conduct as alleged herein, Plaintiff has suffered physical injury, severe emotional distress, humiliation, embarrassment, mental and emotional distress and anxiety, economic harm and other consequential damages.

129. In addition to the Individual Defendants, including Defendant Sowers, CCSF is vicariously liable for these negligent acts under Cal. Gov. Code Section 815.2(a) as the actions of its employees above were within the scope of employment. CCSF also subsequently ratified Defendant Sowers's wrongful conduct as detailed above.

130. The aforementioned conduct by the individual Defendants was willful, wanton, and malicious. At all relevant times, these Defendants acted with conscious disregard of Plaintiff's rights and also acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury and/or humiliation to Plaintiff. Plaintiff is further informed and believes that the individual Defendants intended to cause fear, physical injury and/or pain and suffering to Plaintiff. By virtue of the foregoing, Plaintiff is entitled to recover punitive and exemplary damages.

**FOURTH CAUSE OF ACTION**

**(Retaliation for Engaging in Protected Activity: Violation of Labor Code § 12940(h))**

**(Against Defendant City and County of San Francisco)**

131. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

132. At all relevant times herein mentioned, FEHA, Gov. Code, § 12940, et seq., was in full force and effect and was fulling binding upon Defendant as an employer. Specifically, section 12940(h) makes it an unlawful employment practice for an employer to retaliate against any employee making complaints or opposing discrimination, harassment, or retaliation, or otherwise engaging in activity protected by the FEHA, including for seeking to exercise rights guaranteed under FEHA and/or assisting and/or participating in an investigation, opposing defendant's failure to provide rights, including rights to complain and to assist in a lawsuit, and/or the right to be free of retaliation.

133. Plaintiff engaged in protected activity by making complaints or opposing discrimination, harassment, or retaliation; by otherwise engaging in activity protected by the FEHA, including for seeking to exercise rights guaranteed under FEHA; by assisting and/or

participating in an investigation; and by opposing defendant's failure to provide rights, including rights to complain and to be free of retaliation, discrimination, and harassment.

134. The CCSF punished Plaintiff with a series of adverse employment actions for engaging in the protected activity.

135. Plaintiff's engaging in protected activity under FEHA was a substantial motivating reason for Defendant's decision to subject Plaintiff to adverse employment actions, including, but not limited to, subjecting him to further ongoing harassment and forcing him to transfer workplaces, as well as Defendant's course of conduct that, taken as a whole, materially and adversely affected the terms, conditions, or privileges of Plaintiff's employment.

136. Defendant's unlawful actions were a direct, foreseeable, and proximate cause of the harm suffered by Plaintiff, which included substantial losses in earnings, other employment benefits, and other economic losses, in addition to emotional distress, humiliation, shame, anxiety, depression, and embarrassment, all to Plaintiff's damage in an amount to be proven at the time of trial.

137. WHEREFORE Plaintiff prays for relief as set forth below.

**FIFTH CAUSE OF ACTION**

**(Retaliation: Violation of Labor Code § 1102.5)**

**(Against Defendant City and County of San Francisco)**

138. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

139. At all relevant times, Defendant has been subject to the requirements of Labor Code section 1102.5, which applied to Plaintiff as an employee of Defendant.

140. Plaintiff engaged in protected activity by reporting and objecting to conduct that he reasonably believed to constitute, and in fact was, the illegal acts of his coworkers, Defendant Sowers and his superior officers. Plaintiff reported this conduct to CCSF.

141. Defendant punished Plaintiff with a series of adverse employment actions for objecting to the illegal acts and for his reports of these matters to SFFD superior officers who had authority to investigate or correct legal violations, for which he had reasonable cause to believe

that the information disclosed violations of state laws, rules, and/or regulations. Plaintiff's objections were contributing factors in Defendant's decision to punish Plaintiff with a series of adverse employment actions, including, but not limited to, subjecting him to further ongoing harassment and forcing him to transfer workplaces, as well as Defendant's course of conduct that, taken as a whole, materially and adversely affected the terms, conditions, or privileges of Plaintiff's employment.

142. Defendant's unlawful actions were a direct, foreseeable, and proximate cause of the harm suffered by Plaintiff, which included substantial losses in earnings, other employment benefits, and other economic losses, in addition to emotional distress, humiliation, shame, anxiety, depression, and embarrassment, all to Plaintiff's damage in an amount to be proven at the time of trial.

143. WHEREFORE Plaintiff prays for relief as set forth below.

**SIXTH CAUSE OF ACTION**

**(Race, Color, and Religious Discrimination: Violation of Government Code § 12940(a))**

**(Against Defendant City and County of San Francisco)**

144. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

145. At all relevant times herein mentioned, Defendant was an employer and Plaintiff was an employee of Defendant.

146. At all relevant times herein mentioned, the Fair Employment and Housing Act ("FEHA"), Gov. Code, § 12940, et seq., was in full force and effect and was fulling binding upon Defendant as an employer. Section 12940(a) prohibits an employer from discriminating against an employee because of their race, color, or religious creed.

147. The facts alleged herein, demonstrate that Plaintiff's perceived race, color, and/or religious creed were a substantial motivating reason for Defendant's decision to subject Plaintiff to adverse employment actions that, taken as a whole, materially and adversely affected the terms, conditions, or privileges of Plaintiff's employment.

148. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer substantial losses in earnings, other employment benefits, and other economic losses, in addition to emotional distress, humiliation, shame, anxiety, depression, and embarrassment, all to Plaintiff's damage in an amount to be proven at the time of trial.

149. WHEREFORE Plaintiff prays for relief as set forth below.

**SEVENTH CAUSE OF ACTION**

**(Disability Discrimination: Violation of Government Code § 12940(a))**

**(Against Defendant City and County of San Francisco)**

150. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

151. At all relevant times herein mentioned, Defendant was an employer and Plaintiff was an employee of Defendant.

152. At all relevant times herein mentioned, the Fair Employment and Housing Act ("FEHA"), Gov. Code, § 12940, et seq., was in full force and effect and was fulling binding upon Defendant as an employer. Section 12940(a) prohibits an employer from discriminating against an employee because of their physical disability.

153. Defendant and its agents were aware that Plaintiff suffered from Crohn's disease—a physical disability, were aware of the very serious consequences of a flare up of the disease for Plaintiff, and were aware of what would trigger a flare up. With that knowledge, Defendant's agent intentionally and surreptitiously fed Plaintiff a substance that Plaintiff had repeatedly said would cause a severe flare up. After Plaintiff suffered from a severe flare up and reported the actions of Defendant's agent to Defendant, Defendant's supervisory officers engaged in a prolonged campaign of retaliation against Plaintiff to suppress his complaints and protect the employee who used Plaintiff's medical condition to cause him severe harm. Defendant never held that employee accountable and protected him

154. Plaintiff's physical disability was a substantial motivating reason for Defendant's decision to subject Plaintiff to adverse employment actions that, taken as a whole, materially and adversely affected the terms, conditions, or privileges of Plaintiff's employment.

155. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer substantial losses in earnings, other employment benefits, and other economic losses, in addition to emotional distress, humiliation, shame, anxiety, depression, and embarrassment, all to Plaintiff's damage in an amount to be proven at the time of trial.

156. WHEREFORE Plaintiff prays for relief as set forth below.

**EIGHTH CAUSE OF ACTION**

**(Failure to Take All Reasonable Steps to Prevent Discrimination and Retaliation: Violation of Government Code § 12940(k))**

**(Against Defendant City and County of San Francisco)**

157. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

158. At all relevant times herein mentioned, Defendant was an employer and Plaintiff was an employee of Defendant.

159. At all times herein mentioned, California's FEHA § 12900, et seq., was in full force and effect and was fully binding upon Defendant. Specifically, § 12940(k) makes it an unlawful employment practice for an employer to fail to take all reasonable steps necessary to prevent unlawful discrimination and retaliation from occurring.

160. Plaintiff was subjected to race, color, religious and disability discrimination in the course of his employment, which Defendant failed to take all reasonable steps to prevent.

161. This failure by Defendant was a direct, foreseeable, and proximate cause of the harm suffered by Plaintiff, which included substantial economic losses in addition to emotional distress, humiliation, shame, anxiety, depression, and embarrassment, all to Plaintiff's damage in an amount to be proven at the time of trial.

162. WHEREFORE, Plaintiff prays for relief as set forth below.

**NINTH CAUSE OF ACTION**

**(Harassment in Violation of Government Code § § 12923, 12940(j))**

**(Against Defendants Sowers, Crispen, Molloy, City and County of San Francisco)**

163. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

164. At all relevant times herein mentioned, CCSF was an employer and Plaintiff was an employee of Defendant CCSF. At all relevant times, Defendants were Plaintiff's work supervisors.

165. At all relevant times herein mentioned, FEHA, Gov. Code, § 12940, et seq., was in full force and effect and was fulling binding upon Defendant CCSF as an employer. Specifically, section 12940(j)(1) makes the harassment of an employee because of their race, color, religion, or disability unlawful if the entity, or its agents or supervisors, knew or should have known of this conduct and failed to take immediate and appropriate corrective action.

166. CCSF commanding officers with supervisory authority over Plaintiff, subjected Plaintiff to harassment on the basis of his perceived and/or actual race, color, religion, and disability.

167. The hostile environment created by Defendants' conduct was so severe and pervasive that it altered Plaintiff's working conditions.

168. A reasonable person in Plaintiff's circumstances would have considered the work environment to be hostile, intimidating, offensive, oppressive, or abusive. And, in fact, Plaintiff considered it to be so.

169. Defendants Sowers, Crispen, and Molloy participated in, assisted, and/or encouraged the harassing conduct against Plaintiff.

170. CCSF either directly engaged in the harassment, through its employees, managers, partners, agents and/or assigns, or knew (or should have known) the conduct placed employees at risk of harassment and, on information and belief, failed to take immediate and appropriate corrective or preventative action, action that was within CCSF's control.

171. Defendants' unlawful actions were a direct, foreseeable, and proximate cause of the harm suffered by Plaintiff, which included emotional distress, humiliation, shame, anxiety,

depression, and embarrassment, in addition to economic losses, all to Plaintiff's damage in an amount to be proven at the time of trial.

172. Defendants committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights and safety of Plaintiff and others. Plaintiff is thus entitled to recover punitive damages from Defendants in an amount according to proof.

173. WHEREFORE, Plaintiff prays for relief as set forth below.

**TENTH CAUSE OF ACTION**

**(Intentional Infliction of Emotional Distress)**

**(Against Defendants Crispen, Sowers, Molloy, City and County of San Francisco)**

174. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

175. The conduct of the City's employees and SFFD superior officers, including Defendants Crispen, Sowers, and Molloy, as set forth above, was outrageous and exceeded the boundaries of human decency. This is particularly true here, where aggravating circumstances are present, including the fact that the SFFD superior officer Defendants abused their positions as Plaintiff's supervisors through their conduct described above, positions that gave the superior officer Defendants the power to damage Plaintiff's employment interest, as well as by the fact that the superior officer Defendants knew that Plaintiff was susceptible to injury through mental distress and acted intentionally or unreasonably with the recognition that their actions were likely to result in illness through mental distress to Plaintiff. CCSF retained and protected Defendant Sowers knowing that he had severely battered a fellow City employee, Plaintiff. By allowing Defendant Sowers to remain at Plaintiff's workplace, by shielding Defendant Sowers from accountability, and intimidating Plaintiff to cease cooperation with investigations into Sowers's conduct, CCSF caused substantial harm to Plaintiff.

176. As an actual and proximate result of the wrongful conduct of Defendants, Plaintiff has suffered and continues to suffer severe and continuous humiliation, emotional distress, and

physical and mental pain and anguish, all to his damage in an amount according to proof at the time of trial.

177. CCSF is liable for this conduct because the actions or omissions of its employees, Defendants Sowers, Crispen, and Molloy were within their scope of employment and rise to a cause of action against them. Government Code § 815.2(a).

178. In addition, Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amounting to malice and in conscious disregard of Plaintiff's rights. Because the acts taken toward Plaintiff were carried out by Defendants s acting in a deliberate, cold, callous, and intentional manner in order to injure and damage Plaintiff, Plaintiff is entitled to recover punitive damages from Defendants Sowers, Crispen, and Molloy in an amount according to proof.

**ELEVENTH CAUSE OF ACTION**

**(Violation of 42 U.S.C. Section 2000e, et seq., Race and Color Discrimination)**

**(Against Defendant City and County of San Francisco)**

179. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

180. At all relevant times herein mentioned, Title VII of the Civil Rights Act of 1964, was in full force and effect and was fulling binding upon Defendant as an employer with 15 or more employees. Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer:

> a. To discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color []; or
>
> b. to limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race [or] color [].

181. The facts alleged herein demonstrate that Defendant violated Title VII by engaging in employment discrimination and harassment on the basis of race and color against Plaintiff.

182. In violation of Title VII, Plaintiff was subjected to abusive conduct that was severe and pervasive by his supervisors based on his race and color, altering the conditions of his employment. The conduct was unreasonably abusive and created an offensive and hostile work environment for plaintiff and for any reasonable person in Plaintiff's position.

183. In violation of Title VII, Defendant's management failed to take prompt action to remedy and prevent the discrimination and harassment by Plaintiff's supervisors. Defendant further failed to train, supervise, and monitor their employees and agents.

184. Defendant's failure to take reasonable steps to prevent discrimination and harassment fostered, created and encouraged an environment where such discrimination and harassment was condoned, encouraged, tolerated, sanctioned and/or ratified.

185. Plaintiff's race and color were substantial motivating reasons for Defendant's decision to subject Plaintiff to adverse employment actions that, taken as a whole, materially and adversely affected the terms, conditions, or privileges of Plaintiff's employment.

186. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer substantial losses in earnings, other employment benefits, and other economic losses, in addition to emotional distress, humiliation, shame, anxiety, depression, and embarrassment, all to Plaintiff's damage in an amount to be proven at the time of trial.

187. WHEREFORE Plaintiff prays for relief as set forth below.

**TWELFTH CAUSE OF ACTION**

**(Violation of 42 U.S.C. Section 1983 Racial and Religious Discrimination)**

**(Against Defendants Sowers, Crispen, Molloy, City and County of San Francisco)**

188. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

189. Defendant Sowers and Crispen acted under color of state law in causing the harm alleged herein.

190. By the conduct alleged herein, defendants Sowers, Crispen, and Molloy willfully and without justification deprived Plaintiff of his rights, privileges and immunities as secured to him

by the laws and Constitution of the United States. All Constitutional rights covered, specifically including the due process and equal protection rights as afforded by the 14th (Fourteenth) Amendment in violation of 42 U.S.C. Section 1983.

191. By perpetrating the acts as alleged in this complaint, defendants acted in conformance with the City's custom, practice and/or policy of discriminating against African Americans, especially given that it was Defendants holding the highest level of positions at the SFFD, including Chief of Department Crispen, who both directly undertook and directed the discriminatory adverse employment actions against Plaintiff and otherwise affirmatively ratified the adverse actions taken by his subordinate officers.

192. WHEREFORE Plaintiff prays for relief as set forth below.

**THIRTEENTH CAUSE OF ACTION**

**(Violation of 42 U.S.C. Section 1981 Racial Discrimination)**

**(Against Defendants Crispen, Sowers, Molloy, City and County of San Francisco)**

193. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

194. In doing the acts alleged herein, Defendants intentionally and without justification deprived Plaintiff of the rights, privileges and immunities secured to him by the Constitution and laws of the United States, including Plaintiff's right to be free from discrimination based on his race as provided by 42 U.S.C. Section 1981.

195. Plaintiff's race was a but-for cause for Defendants' decision to subject Plaintiff to adverse employment actions, including, but not limited to, eliminating Plaintiff's compensation and knowingly subjecting him to dangerous working conditions, as well as engaging on a course of conduct that, taken as a whole, materially and adversely affected the terms, conditions, or privileges of Plaintiff's employment.

196. As a direct, foreseeable, and proximate result of Defendants' unlawful actions, Plaintiff has suffered and continues to suffer substantial losses in earnings, other employment benefits, and other economic losses, in addition to emotional distress, humiliation, shame, anxiety,

depression, and embarrassment, all to Plaintiff's damage in an amount to be proven at the time of trial.

197. By perpetrating the acts as alleged in this complaint, defendants acted in conformance with the City's custom, practice and policy of discriminating against Black people.

198. Defendants' conduct as detailed in this complaint violates 42 U.S.C. Section 1981.

199. WHEREFORE plaintiff prays for relief as set forth below.

**FOURTEENTH CAUSE OF ACTION**

**(Violation of 42 U.S.C.S. §§ 12101, *et seq*., Americans with Disabilities Act Discrimination)**

**(Against Defendant City and County of San Francisco)**

200. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

201. 42 U.S.C.S. § 12112 of the Americans with Disability Act ("ADA") provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." Discrimination in violation of the ADA includes "limiting . . . [an] employee in a way that adversely affects the opportunities or status of such . . . employee because of the disability of such . . . employee", "utilizing standards, criteria, or methods of administration . . . that perpetuate the discrimination of others who are subject to common administrative control", and "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C.S. § 12112(b).

202. At all relevant times herein mentioned, the ADA and its implementing regulation, 29 C.F.R. Part 1630, were in full force and effect and were fulling binding upon Defendant as a covered entity.

203. Plaintiff is a qualified individual. If given reasonable accommodation, Plaintiff would have been able to perform his essential job duties. Such reasonable accommodations included adhering to his dietary restrictions to prevent a flare of his physical disability.

204. Defendant decided to subject Plaintiff to adverse employment actions that, taken as a whole, materially and adversely affected the terms, conditions, or privileges of Plaintiff's employment because of Plaintiff's disability. Defendant limited Plaintiff's opportunities and the status of his employment because of his disability. Defendant utilized methods of administration that perpetuated the discrimination of others against Plaintiff who are subject to common administrative control. Defendant did not make reasonable accommodations to the known physical limitations of Plaintiff.

205. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer substantial losses in earnings, other employment benefits, and other economic losses, in addition to emotional distress, humiliation, shame, anxiety, depression, and embarrassment, all to Plaintiff's damage in an amount to be proven at the time of trial.

206. WHEREFORE Plaintiff prays for relief as set forth below.

**FIFTEENTH CAUSE OF ACTION**

**(Violation of 42 U.S.C.S. §§ 12101, *et seq*., Americans with Disabilities Act Interference, Coercion, Intimidation, Retaliation)**

**(Against Defendant City and County of San Francisco)**

207. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

208. 42 U.S.C.S. § 12203 (a) provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."

209. 42 U.S.C.S. § 12203 (b) provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this Act."

210. Plaintiff engaged in protected activity, including by requesting accommodations of Defendant for his physical disability, opposing the adverse acts and practices of Defendant taken against Plaintiff on the basis of his disability, making charges of disability discrimination against Defendant, and participating in official government investigations of this disability discrimination. Defendant knew Plaintiff engaged in this protected activity.

211. CCSF punished Plaintiff with a series of adverse employment actions for engaging in the protected activity.

212. Plaintiff's seeking to exercise rights guaranteed under the ADA was a substantial motivating reason for Defendant's decision to subject Plaintiff to adverse employment actions, including, but not limited to Defendant's course of conduct that, taken as a whole, materially and adversely affected the terms, conditions, or privileges of Plaintiff's employment.

213. Defendant's unlawful actions were a direct, foreseeable, and proximate cause of the harm suffered by Plaintiff, which included substantial losses in earnings, other employment benefits, and other economic losses, in addition to emotional distress, humiliation, shame, anxiety, depression, and embarrassment, all to Plaintiff's damage in an amount to be proven at the time of trial.

214. WHEREFORE Plaintiff prays for relief as set forth below.

**SIXTEENTH CAUSE OF ACTION**

**(Violation of Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C §§ 794, et. seq.)**

**(Against Defendant City and County of San Francisco)**

215. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

216. Section 504 and its implementing regulations prohibit employers from discriminating against employees on the basis of disability, as well as employers' failure to accommodate disabilities.

217. At all times relevant hereto, Defendant City and County of San Francisco was and is a recipient of Federal funds subject to Section 504.

218. Section 504 expressly incorporates the anti-interference provisions of the ADA, 42 U.S.C.S. § 12203.

219. Plaintiff is a qualified individual. If given reasonable accommodation, Plaintiff would have been able to perform his essential job duties. Such reasonable accommodations included adhering to his dietary restrictions to prevent a flare of his physical disability.

220. Defendant decided to subject Plaintiff to adverse employment actions that, taken as a whole, materially and adversely affected the terms, conditions, or privileges of Plaintiff's employment because of Plaintiff's disability. Defendant limited Plaintiff's opportunities and the status of his employment because of his disability. Defendant utilized methods of administration that perpetuated the discrimination of others against Plaintiff who are subject to common administrative control. Defendant did not make reasonable accommodations to the known physical limitations of Plaintiff.

221. As a direct, foreseeable, and proximate result of Defendant's unlawful actions, Plaintiff has suffered and continues to suffer substantial losses in earnings, other employment benefits, and other economic losses, in addition to emotional distress, humiliation, shame, anxiety, depression, and embarrassment, all to Plaintiff's damage in an amount to be proven at the time of trial.

222. WHEREFORE Plaintiff prays for relief as set forth below.

## SEVENTEENTH CAUSE OF ACTION

**(Violation of Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C §§ 794, et. seq. Interference, Coercion, Intimidation, Retaliation)**

**(Against Defendant City and County of San Francisco)**

223. Plaintiff re-alleges and incorporates herein by reference each and every allegation of the preceding paragraphs as though fully set forth herein.

224. Section 504 and its implementing regulations prohibit employers from discriminating against employees on the basis of disability, as well as employers' failure to accommodate disabilities.

225. Section 504 expressly incorporates the anti-interference provisions of the ADA, 42 U.S.C.S. § 12203.

226. In addition, Section 504's implementing regulations, 28 C.F.R. § 42.503 (b)(1)(vii) prohibit Defendant from intimidating retaliating against any individual for the purpose of interfering with any right secured by Section 504.

227. At all times relevant hereto, Defendant City and County of San Francisco was and is a recipient of Federal funds subject to Section 504.

228. Plaintiff engaged in protected activity, including by requesting accommodations of Defendant for his physical disability, opposing the adverse acts and practices of Defendant taken against Plaintiff on the basis of his disability, making charges of disability discrimination against Defendant, and participating in official government investigations of this disability discrimination. Defendant knew Plaintiff engaged in this protected activity.

229. CCSF punished Plaintiff with a series of adverse employment actions for engaging in the protected activity.

230. Plaintiff's seeking to exercise rights guaranteed under Section 504 was a substantial motivating reason for Defendant's decision to subject Plaintiff to adverse employment actions, as well as Defendant's course of conduct that, taken as a whole, materially and adversely affected the terms, conditions, or privileges of Plaintiff's employment.

231. Defendant's unlawful actions were a direct, foreseeable, and proximate cause of the harm suffered by Plaintiff, which included substantial losses in earnings, other employment benefits, and other economic losses, in addition to emotional distress, humiliation, shame, anxiety, depression, and embarrassment, all to Plaintiff's damage in an amount to be proven at the time of trial.

232. WHEREFORE Plaintiff prays for relief as set forth below.

**REQUEST FOR PUNITIVE DAMAGES**

**(California Civil Code Section 3294)**

233. Plaintiff incorporates by reference each of the foregoing paragraphs as if they were set forth fully herein.

234. The individual Defendants committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice, and in conscious disregard of the rights and safety of Plaintiff and others. The conduct of the individual Defendants as alleged herein is extreme and outrageous and falls within the protection of California Civil Code Section 3294 for the imposition of punitive damages against the individual Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, prays for judgment against Defendants as follows:

1. For compensatory damages, including but not limited to, lost back pay, plus interest, lost fringe benefits and future lost earnings and fringe benefits, lost equity, damages for emotional distress and pain and suffering, according to proof allowed by law;
2. For punitive damages allowed by law;
3. For restitution and/or disgorgement;
4. For an award to Plaintiff of costs of suit incurred herein and reasonable attorneys' fees;
5. For an award of prejudgment and post-judgment interest; and
6. For an award to Plaintiff of such other and further legal and equitable relief as the Court deems just and proper.

Dated: November 10, 2026 TORRES & TOLMAN

By: /s/ James J. Torres
James J. Torres

*Attorneys for Plaintiff*

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, plaintiff hereby demands a trial by jury on all issues triable to a jury in each cause of action of his complaint.

Dated: November 10, 2026

TORRES & TOLMAN

By: /s/ James J. Torres
James J. Torres

*Attorneys for Plaintiff*